UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

C.H., II, ET AL.                                                                                          PLAINTIFFS

V.                                                                      CIVIL ACTION NO. 3:08cv84-DPJ-JCS

RANKIN COUNTY SCHOOL DISTRICT, ET AL.                                              DEFENDANTS

ORDER

This civil rights action is before the Court on two motions. First, the Rankin County School District, and its employees Kalvin Robinson, Richard Morrison, and Wendy Clemons (Tucker), have filed a motion for summary judgment as to all of Plaintiffs' claims [100].[1] Second, Plaintiffs have filed objections to the denial of their motion for an extension of the discovery deadline by Magistrate Judge James C. Sumner [103].

**I.      Facts and Procedural History**

Plaintiffs L.H. and C.H. filed this action on behalf of their son, C.H. II, against the Rankin County School District, the City of Flowood, Hinds Community College, and several individuals employed by these three entities. The case stems from two discrete disciplinary actions occurring in June 2006 and September 2007. The facts are set out in detail in the Court's March 30, 2009 Order [42]. In that order, the Court dismissed Plaintiffs' claims against Officers Wealton Beverly and Dimitri Ellison; the City of Flowood; and Cheryl Lott and Jerry Cox, employees of Hinds Community College. A subsequent order dismissed Plaintiffs' claims against Hinds Community College [129]. Thus, only Plaintiffs' claims against the RCSD and its employees ("RCSD Defendants") remain pending.

---

[1]For clarity in the record, this order will refer to Clemons as "Tucker," the name that appears throughout discovery.

All of the remaining claims stem from a June 2006 after-school fight between C.H. II (African-American) and a fellow student G.G. (Caucasian). The following facts are not disputed in the record. The two youths had been arguing for several days, culminating in an understanding on C.H. II's part, and among other students, that a fight would occur after school by the athletic field house. Tr. of Nov. 10, 2006, Hearing at 55-56. Standing in a circle of students, G.G. threw the first punch but missed. C.H. II then struck G.G., knocked him to the ground, got on top of him, punched him in the body and head, and bloodied his face. When Assistant Principal Morrison arrived, C.H. II knew he was in trouble. Other students began to disperse, and there was no ambiguity as to who was involved in the fight. C.H. II had scrapes on his fingers and knees, G.G. was bleeding from his head. According to Plaintiffs, G.G. informed Morrison that the fight was not C.H. II's fault, and both students asked that Morrison not call the police.

Consistent with school policy, the police were called as to both young men. Upon their arrival, Defendant Morrison claimed to have seen the fight and gave a statement that describes the fight in a manner consistent with C.H. II's own testimony. Although G.G., who was more seriously injured, was initially taken to the hospital by his mother, Morrison also offered to come to the station and charge both students. Pl.'s Resp. at 20. Both C.H. II and G.G. were charged with the same offense and received the same punishment from the school.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 claiming that the RCSD Defendants, in their individual and official capacities, violated C.H. II's constitutional rights. More specifically, Plaintiffs claim (1) unlawful arrest; (2) violation of C.H. II's equal protection rights by treating him differently from white students; (3) prosecution in the wrong court; and (4)

violation of C.H. II's due process rights in the manner he was suspended from summer school. The RCSD Defendants have moved for summary judgment, and Plaintiffs have challenged a discovery ruling by Magistrate Judge James Sumner. Personal and subject matter jurisdiction exist, and the issues are now ripe for consideration.

II.  RCSD Defendants' Motion for Summary Judgment

A.  Summary Judgment Standard

Summary judgment is warranted under Rule 56(c) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Instead, when the movant shows the absence of a genuine issue of material

3

fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). A simple plea for a jury trial on the bare assertion that there are genuine issues of material fact is not a sufficient response to a motion for summary judgment. *F.D.I.C. v. Brewer*, 823 F. Supp. 1341, 1347 (S.D. Miss. 1993) (citing *Washington v. Armstrong World Indus., Inc.*, 839 F.3d 1121, 1122–23 (5th Cir. 1988)).

In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000).[2]

B. False Arrest

Plaintiffs first allege that the RCSD Defendants arrested C.H. II without probable cause. As an initial point, the parties dispute which Fourth Amendment standard applies to a seizure initiated by school officials. There is a strong argument that probable cause is not required. *See Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250 (10th Cir. 2008) (holding probable cause not required for seizures at school) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)). However, the Court need not resolve this dispute, because the RCSD

---

[2] Both parties also address the doctrine of qualified immunity, which "offers a shield against civil liability for government employees insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (internal quotation omitted). Because the Court finds C.H. II's constitutional rights were not violated, it is not necessary to reach that issue.

Defendants did not violate C.H. II's Fourth Amendment rights even under the more stringent probable cause standard for an arrest.

"The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Piazza v. Mayne*, 217 F.3d 239, 245-46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

The gist of Plaintiffs' argument is that Defendant Morrison did not see the fight or interview any witnesses and therefore lacked probable cause to arrest C.H. II. This argument misinterprets the facts and the proper inquiry. The question is whether Morrison possessed enough information to warrant the conclusion by a prudent person that C.H. II and G.G. were the two participants in the fight that caused the disturbance. Morrison conceded that he could not identify who was involved in the fight when he was driving up, but he could tell that the student on top was African-American and the student on the bottom was Caucasian. Once Morrison approached the fight, he was able to identify the participants and their relative positions. Morrison Dep. at 22. C.H. II's own testimony demonstrates that Morrison would have known who was involved. C.H. II testified that both he and G.G. were bloody, G.G. discussed the fight with Morrison saying it was not C.H. II's fault, and both pleaded with Morrison not to call the police. *Id*. at 38. These circumstances alone establish probable cause to believe C.H. II and G.G. were the two students involved in the fight. *DeFillippo*, 443 U.S. at 37.

That said, there is no *genuine* dispute that Morrison saw at least some portion of the fight in progress.[3] Even assuming C.H. II did not see Morrison driving up until he finished beating G.G., that does not contradict Morrison's consistent statements and testimony that he viewed a portion of the fight as he approached in his car. Significantly, Morrison's statement to the police at the scene is perfectly consistent with C.H. II's own description regarding the fight. *See* C.H. II Dep. at 31. In a post-suspension hearing, Defendant Morrison gave a more detailed account of what he saw.

> When I drove up, I noticed that [C.H. II] was on top of [G.G]. And I guess the - what alarmed me was I saw some kicks, [C.H. II] kicking [G.G]. He was on the bottom. [C.H. II] was kicking him and took his head and hit him into the concrete, took his head and hit it into the concrete. And I got out of the vehicle. I guess when I got out and they saw it was me, you know, some students started to disperse. I said something, "Hey," you know, and did not know, but [C.H. II] and [G.G.] stopped and they tried, you know, to leave. And I held them there until we could get some help there, called for some other administrators, and then we called the police.

Tr. of Nov. 10, 2006 Hearing at 5. When questioned about the intensity of the fight, Morrison described the fight as "one of the worst that [he had] seen." *Id.* at 8. Morrison's deposition testimony is consistent with this account. Accordingly, Morrison saw enough to know that C.H. II and G.G. were the two participants in a bloody fight before a circle of onlookers. Probable cause existed to initiate the arrest. *DeFillippo*, 443 U.S. at 37. Defendants' motion for summary judgment is granted as to this claim.

    C.    *Equal Protection*

---

[3]Viewing the fight from start to finish was not necessary because the identity of the instigator was not relevant to the charges.

Plaintiffs' second complaint with respect to the arrest is that Defendants treated C.H. II differently than G.G., thereby violating C.H. II's equal protection rights. It must first be noted that school officials called the police as to both students, offered to sign charges as to both, charged both with the same crime, and punished both with identical ten-days suspensions from the school.

The issue here is whether C.H. II's rights were violated because he was immediately arrested and G.G.'s mother was allowed to first take him to the hospital. It is not entirely clear how this claim relates to the RCSD Defendants. Regardless, this issue was addressed in the Court's March 30, 2009 Order [42], in the context of considering the police officers' motion to dismiss. As stated in that order, there was no equal protection violation in this instance because C.H. II and G.G. were not similarly situated and a rational basis existed for different treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007). The record is now even more complete on this point.

C.H. II testified that he had scrapes on his knees and fingers. C.H. II Dep. at 34. He explained that was evaluated by an EMT and was told he would be alright. *Id.* at 41. By contrast, C.H. II testified that G.G. was bleeding from his head, had scratches on his eyes, and was generally hurt worse than he was. *Id.* at 34-35. Likewise, Morrison testified that he asked each if he was okay. Morrison Dep. at 50. C.H. II told Morrison his knuckles were skinned but he was okay. *Id.* Morrison stated that G.G. "could not answer [him] very coherently, he was confused . . . [and] [he] had blood on his face." *Id.* Morrison described G.G. as "dazed" and concluded he was not okay. *Id.* Finally, C.H. II testified that G.G. refused to get into the

7

ambulance because he was worried about the cost and was taken to the hospital by his mother. C.H. II Dep. at 42.

Thus, C.H. II and G.G. were not "similarly situated" in that G.G. required medical attention. *Vill. of Willowbrook*, 528 U.S. at 564. Alternatively, even if the two young men could be considered similarly situated, G.G.'s need for medical treatment reflects "a rational basis for the difference in treatment." *Id*. Ultimately though, both young men were arrested on the same day under the same charges and received the same suspension.[4] As such, Plaintiffs have failed to state a valid equal protection claim against the RCSD Defendants.

D. *Due Process/Youth Court Act*

After the arrest, Plaintiff was processed in municipal court rather than youth court. Plaintiffs claim that this violated C.H. II's substantive and procedural due process rights. Again, it is not clear how the RCSD Defendants are responsible for these allegations that appear to have been directed more squarely against the arresting officers and the City of Flowood. Regardless, the Court ruled in its March 30, 2009 Order [42] that the allegations fail to demonstrate a constitutional violation. That ruling applies with equal force to the RCSD Defendants, and the claim will be dismissed for the reasons stated in the prior order.

E. *Due Process/Suspension*

The day after the arrest, C.H. II returned to school and was later suspended for ten days. Plaintiffs claim that the RCSD Defendants thereby violated C.H. II's right to procedural due process. "To prevail on a procedural or substantive due process claim, the plaintiffs must show

---

[4] The Incident Report attached to the police officers' motion to dismiss indicated that both C.H. II and G.G. were charged with the same offense and G.G. was taken to the hospital by his mother. *See* Ex. A to [37] Motion to Dismiss.

that they were deprived of a constitutionally protected property or liberty interest." *Esparza v. Bd. of Trs.*, 182 F.3d 915, 1999 WL 423109, at *3 (5th Cir. 1999) (unpublished table decision) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)); *see also Nunez v. Simms*, 341 F.3d 385, 387 (5th Cir. 2003) ("In order to allege a due process deprivation of a property interest under the Fourteenth Amendment, the plaintiff must demonstrate a legitimate claim of entitlement to that interest." (internal quotation omitted)). An entitlement to public education is a recognized property interest protected by the due process clause of the Fourteenth Amendment. *See Goss v. Lopez*, 419 U.S. 565, 575 (1975); *Brewer by Dreyfus v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 262 (5th Cir. 1985). In this case, C.H. II received the process he was due.

In *Goss*, the Supreme Court described the "informal give-and-take between student and disciplinarian" that satisfies procedural due process requirements in a short suspension, such as ten days. 419 U.S. at 584.

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. . . . There need be no delay between the time "notice" is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Id.* at 581-82. Both parties agree that the standard announced in *Goss* applies to this case.[5]

Plaintiffs argue in their Response, without record citation, that Principal Tucker did not give C.H. II adequate notice of the charge or afford him an opportunity to respond. Pl.'s Mem. at 23. However, this bald assertion is contradicted by the testimony of C.H. II and Tucker. First, there is no dispute that Tucker informed C.H. II that he would be suspended for ten days. In fact, C.H. II argued for a shorter suspension. C.H. II Dep. at 53. Second, there is no dispute that C.H. II knew why he was being suspended. *Id.* at 52. Third, contrary to the argument that he was not given a chance to explain his side of the story, C.H. II testified that, before the punishment was announced, Tucker asked him why he was at the principal's office. *Id*. C.H. II testified that in response to Tucker's question, he "told her." *Id*. At best, Plaintiffs urge a question of fact simply because C.H. II was not asked during his deposition to elaborate on what he "told her."

In any event, this negative gloss on C.H. II's testimony cannot create a genuine question of fact given Tucker's clear statement that she heard and considered C.H. II's explanation. During one of two post-suspension hearings, Tucker was asked by C.H. II's attorney to admit that C.H. II had told her he acted in self-defense. Ex. Y to Defs.' Mot at 32-33. Tucker agreed that C.H. II claimed self-defense. *Id*. She also explained that she considered C.H. II's position, but concluded that he did not act in self-defense because (1) C.H. II and G.G. had exchanged words earlier and C.H. II went to the field house and waited for G.G. to engage in the fight; and (2) G.G. "was lying on the ground practically incoherent, did not know his name, and [C.H. II]

---

[5]Plaintiffs do not cite *Goss* directly, but the cases they cite for the appropriate standard apply *Goss*. *See Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 639 (6th Cir. 2004) (citing *Goss*, 419 U.S. at 583); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1359 (6th Cir. 1996) (citing *Goss*, 419 U.S. at 581).

was kicking and beating his head against concrete." *Id*. There is no genuine dispute of material fact. As the record stands, C.H. II received all of the process *Goss* requires.[6]

    F.    *Municipal Liability as to RCSD*

Municipalities are subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Municipal liability under § 1983 requires proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). "Municipal liability cannot be sustained under a theory of respondeat superior. [Rather,] the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (internal citations and quotations omitted).

RCSD has moved the Court to dismiss the § 1983 claims. As stated *supra*, a municipality is liable under § 1983 only if a policy or custom was the "moving force" behind a constitutional violation. *Piotrowski*, 237 F.3d at 578. Having found no constitutional violations, dismissal of Plaintiffs' claims against RCSD is likewise appropriate.

---

    [6] Defendants also assert that summary judgment is appropriate as to any claim for a violation of substantive due process. Plaintiffs do not address substantive due process in their Response. The Court finds that the substantive due process claim has been waived and is otherwise lacking in merit. *See Foster v. Tupelo Pub. Sch. Dist.*, 569 F. Supp. 2d 667, 674 (N.D. Miss. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 38-40 (1973)).

III.     Magistrate Judge's Decision

Plaintiffs filed objections to Magistrate Judge Sumner's denial of an extension of the time to conduct discovery, which the Court construes as an appeal of a magistrate judge's order pursuant to Rule 72 of the Uniform Local Rules. Rule 72(a)(1)(B) provides that

> [n]o ruling of a magistrate judge in any matter in which he or she is empowered to hear and determine shall be reversed, vacated, or modified on appeal unless the district judge determines that the magistrate judge's findings of fact are clearly erroneous, or that the magistrate judge's ruling is clearly erroneous or contrary to law.[7]

The "clearly erroneous" standard requires that the court affirm the decision of the magistrate judge unless "on the entire evidence [the court] is left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also* FED. R. CIV. P. 72(a).

On April 6, 2009, Judge Sumner entered a case management order that set the discovery deadline as September 28, 2009. The RCSD Defendants propounded discovery on April 6, but Plaintiffs waited until August 21, 2009, to submit their first set of interrogatories and their first set of requests for production of documents to the RCSD Defendants. Plaintiffs submitted a second set of interrogatories on August 28. On the day discovery was set to close, Plaintiffs filed their motion for an extension of the discovery deadline, citing Defendants' objections to several requests and a potential need to resume one or more previously conducted depositions based on the possible production of additional documents.

---

[7] The Uniform Local Rules were amended on December 1, 2009, after Plaintiffs' motion was filed. Rule 72(a)(1)(B) was changed only to the extent that the word "shall" was replaced with "will."

Judge Sumner denied the motion for an extension, concluding that Plaintiffs had failed to establish good cause for the requested extension. He specifically found, "the obvious cause of Plaintiffs' current situation is their failure to initiate discovery in a timely manner." Order at 2.[8] Discovery decisions are given wide latitude, and having considered the record in this case, the Court cannot say that it is "left with a definite and firm conviction that a mistake has been committed." *Id.* Moreover, the Court fails to see how the requested discovery would enable Plaintiffs to avoid summary judgment. The requested discovery is aimed at determining how much of the fight Defendant Morrison saw, but as stated above, even accepting C.H. II's testimony, Morrison saw enough to know that C.H. II and G.G. were involved in a bloody altercation that attracted other student spectators. The ruling of the magistrate judge is affirmed.

## IV. Conclusion

Based on the foregoing, the Court finds that Plaintiffs' claims should be dismissed against the RCSD Defendants. As this Order disposes of all remaining claims in this case, the Court finds this action should be dismissed with prejudice. A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 16th day of April, 2010.

        s/ *Daniel P. Jordan III*
        UNITED STATES DISTRICT JUDGE

---

[8] After filing the instant motion for review, Plaintiffs filed a motion to compel discovery responses, which Judge Sumner granted in part and denied in part.